UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CANADIAN NATIONAL RAILWAY CO.,
and GRAND TRUNK WESTERN RAILROAD,
INC.,

                                  CIVIL CASE NO. 04-40323

                Plaintiff,

v.                                 HONORABLE PAUL V. GADOLA
                                 U.S. DISTRICT COURT
CITY OF ROCKWOOD, and WAYNE
COUNTY,

                Defendant.
_____/

**OPINION AND ORDER GRANTING PRELIMINARY INJUNCTION**

In this action for declaratory and injunctive relief, Plaintiffs Canadian National Railway Co., and its subsidiary, Grand Trunk Western Railroad, Inc. ("GTW"), (collectively "CN") move the Court for a preliminary injunction preventing Defendants City of Rockwood and Wayne County from enforcing against CN zoning laws, permitting and preclearance requirements, and other state and local regulations. Although CN's motion seeks a temporary restraining order and a preliminary injunction, CN's counsel has communicated to the Court that they are seeking only a preliminary injunction. As a result of this communication, the court will only consider the request for a preliminary injunction, which, for the following reasons, the Court will grant.

**I.    BACKGROUND**

CN is an interstate rail transportation carrier operating rail lines and facilities in various states including Michigan. Desiring to enter the market for hauling construction and demolition debris ("CDD"), CN constructed a transload facility on property owned by GTW in the city of Rockwood, Michigan. This facility allows CDD transported from various locales by rail to be moved from rail cars onto trucks, which then haul the CDD to a nearby facility to dispose of it. Construction of the facility began in late October, 2004 and was completed in late November, 2004. The facility has been operational since December 6, 2004.

CN does not operate the transload facility. Instead, it has entered into an agreement with Industrial Waste Group, L.L.C. ("IWG"), to operate the facility. IWG in turn uses its affiliate J.R. Wolfe Co. to perform the actual operation of the equipment at the facility. It is, however, CN, not IWG or its affiliate, which enters into contracts with shippers, bills and collects from the shippers, and is liable to the shippers. CN sets the rates which comprise all IWG's compensation for services rendered. Furthermore, IWG must use equipment and personnel approved by CN, must meet the requirements set by CN in their shipping contracts, must perform the transloading services to CN's satisfaction, and must comply with CN's safety and behavior rules and guidelines. Nevertheless, the agreement between CN and IWG provides that IWG is

2

to bear the sole responsibility and expense of constructing, maintaining, and operating the transload facility, as well as ensuring that the facility complies with all applicable laws. The agreement expressly states that IWG is to act as an independent contractor and that the agreement does not create an agency relationship between CN and IWG. Finally, the agreement contains an extensive indemnification clause that requires IWG to indemnify and hold CN harmless from all liabilities, claims, costs, etc., arising from IWG's activities. The indemnification, though, does not extend to consequential, special, incidental, or punitive damages. <u>See</u> <u>generally</u> Terminal Construction and Services Agreement, Pl. Ex. 4 (from hearing).

In early November, 2004, before construction of the facility was completed, the city of Rockwood delivered to CN a stop work order on the basis that CN had failed to obtain the necessary permits for the construction. The order required CN to cease and desist from further construction on the site until health and safety measures adopted by the state, county, and city have been met. Shortly thereafter, the Wayne County Department of the Environment served CN with an order to cease and desist all earth changing activity until they had obtained a permit pursuant to the Wayne County Soil Erosion and Sedimentation Control Ordinance.

According to Wayne County, CN must comply with Wayne County's

3

Soil Erosion Ordinance and Solid Waste Ordinance.  The Soil Erosion Ordinance required that CN obtain a permit for their earth disturbance and erect a silt barrier to prevent silt from washing into a nearby creek.  The Solid Waste Ordinance requires that CN pave the interior haul road of the facility, operate the facility in a manner that controls fugitive dust, such as by enclosing the facility in a building, and submit a site plan to the county for its approval.  The county is also requiring CN to submit an off-site road maintenance plan and a facility inclusion application.  Finally, state law requires that CN operate the facility in accordance with an approved site plan.

CN denies that it is subject these state and local regulations, because the regulations attempt to regulate transportation by rail and any such state or local regulation is preempted by the Interstate Commerce Commission Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995) ("ICCTA").  Defendants, on the other hand, maintain that CN is subject to the regulations regardless of the ICCTA because the activities conducted at the transload facility are not "transportation by rail carrier," because IWG is not transporting by rail, but by truck, and IWG is not a rail carrier, but a refusal hauler.  49 U.S.C. § 10501(a).  Defendants also maintain that the regulations at issue are not preempted by the ICCTA because they are environmental

4

regulations that do not prevent the operation of the transload
facility and are a valid exercise of Defendants' police power to
protect the health and safety of the community.   Finally,
Defendants argue that any preemption of Defendants' regulations by
the ICCTA would be unconstitutional.

## II.   ANALYSIS

When ruling on a motion for a preliminary injunction, a
district court must consider and balance four factors:

> (1)   whether the movant has a strong likelihood of
> success on the merits;
>
> (2)   whether the movant would suffer irreparable injury
> without the temporary restraining order;
>
> (3)   whether issuance of the temporary restraining order
> would cause substantial harm to others; and
>
> (4)   whether the public interest would be served by
> issuance of the temporary restraining order.

Memphis Planned Parenthood, Inc. v. Sundquist, 175 F.3d 456, 460
(6th Cir. 1999);   Blue Cross & Blue Shield Mutual of Ohio v.
Columbia/HCA Healthcare Corp., 110 F.3d 318, 322 (6th Cir. 1997);
DeLorean Motor Co. v. DeLorean, 755 F.2d 1223, 1228 (6th Cir.
1985).   These four considerations "are factors to be balanced, not
prerequisites that must be met."   DeLorean, 755 F.2d at 1229.   A
district court must make specific findings concerning each of the
four factors unless fewer are dispositive of the issue.
Performance Unlimited v. Questar Publishers, Inc., 52 F.3d 1373,

5

1381 (6th Cir. 1995).  As will be explained below, the balance of the factors favors granting the preliminary injunction.

**A.  Whether CN and GTW have a strong likelihood of success on the merits.**

Congress enacted the ICCTA as a means of reducing the regulation of the railroad industry.  The hope was to foster railroad transportation as a safe, effective, competitive, and reasonable mode of transportation.  See 49 U.S.C. § 10101.  To this end, the ICCTA created the Surface Transportation Board ("STB") and expressly granted it exclusive jurisdiction over—

> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State.

49 U.S.C. § 10501(b).  The remedies provided by the ICCTA "with respect to rail transportation are exclusive and preempt the remedies provided under Federal or State law."  Id.  The jurisdiction of the STB, however, is limited to "transportation by rail carrier." 49 U.S.C. § 10501(a).  By definition, "transportation" includes:

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or

6

> equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and
>
> (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.

49 U.S.C. § 10102(9). "Rail carrier" is defined as "a person providing common carrier railroad transportation for compensation."

49 U.S.C. § 10102(5). Finally, included in the definition of "railroad" are:

> (A) a bridge, car float, lighter, ferry, and intermodal equipment used by or in connection with a railroad;
>
> (B) the road used by a rail carrier and owned by it or operated under an agreement; and
>
> (C) a switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation.

49 U.S.C. § 10102(6). If activities meet this definition of transportation by rail carrier, the STB has exclusive jurisdiction. 49 U.S.C. 10501(b). Generally, any state and local laws or regulations that intrude upon this jurisdiction are preempted. Railroad Ventures, Inc. v. Surface Transp. Bd., 299 F.3d 523, 561-63 (6th Cir. 2002). "To come within the preemptive scope of 49 U.S.C. 10501(b), these activities must be both: (1) transportation; and (2) performed by, or under the auspices of, a rail carrier." Hi Tech Trans., LLC, Petition for Declaratory Order, S.T.B. Finance Docket No. 34191, at 5 (Aug. 14, 2003) (Slip Op.). Under this

7

standard, activities occurring at CN's transload facility appear to meet the definition of "transportation by rail carrier," which would cause Defendants' regulations to be preempted.

Defendants argue that this is not the case because the activities do not meet the ICCTA's definition of "transportation." This Court, though, agrees with the decision of other courts and of the STB, which have held that the activities which take place at such transload facilities are considered "transportation" by the ICCTA. See Green Mt. R.R. Corp. v. Vermont, 404 F.3d 638, 644 (2d Cir. 2005)("[The Railroad] serves industries that rely on trucks to transport goods from the rail site for processing; so the proposed transloading and storage facilities are integral to the railroad's operation and are easily encompassed within the Transportation Board's exclusive jurisdiction over 'rail transportation.'"); Grafton & Upton R.R. Co. v. Town of Milford, 337 F. Supp. 2d 233, 239 (D. Mass. 2004)("Although the [railroad] Yard will clearly have a trucking component, an examination of the analogous scenarios discussed in the cited caselaw demonstrates that such a non-rail component is still subject to the preemptive effect of the ICCTA."); Norfolk Southern Ry. Co. v. City of Austell, 1997 WL 1113647, *6 (N.D. Ga.1997)("Based upon the clear and unambiguous language of the ICCTA, the court concludes that the instant intermodal facility comes within the ICCTA's definition of

8

'transportation by rail carriers' over which the STB is given exclusive jurisdiction under 49 U.S.C. § 10501(b)(1). It is uncontroverted that intermodal facilities are facilities that are operated in order to transfer containers or trailers of cargo being shipped in interstate and foreign commerce between trains and tractor-trailer trucks in a manner which permits and promotes effective competition and coordination between rail and motor carriers."). See also See Hi Tech Trans, STB Finance Docket No. 24192 (Slip Op. at 5-6) ("There is no dispute that Hi Tech's transloading activities are within the broad definition of transportation. The Board has consistently found such activities to be transportation under 49 U.S.C. 10102(9). See Green Mountain Railroad Corporation – Petition for Declaratory Order, STB Finance Docket No. 34052 (STB served May 28, 2002)(Green Mountain)(cement transloading facility); Joint Petition for Declaratory Order – Boston and Maine Corporation and Town of Ayer, MA, STB Finance Docket No. 33971 (STB served May 1, 2001) (Ayer)(automobile unloading facility).").

Defendants further argue that the facility's activities are not "transportation by rail carrier" because IWG, the facility's operator, is not a rail carrier. Defendants rely on precedent which held that certain bulk distribution centers operated by third-parties on land leased from the railroad were not subject to

STB's jurisdiction or federal preemption.  See CFNR Operating Co. v. City of American Canyon, 282 F. Supp. 2d 1114, 1118 (N.D. Cal. 2003)(holding that the city's regulations were focused on "non-railroad business activities"); Florida East Coast Ry. Co. v. City of West Palm Beach, 266 F.3d 1324, 1329 (11th Cir 2001)(holding that the city's ordinances did "not constitute 'regulation of rail transportation.'"); Growers Marketing Co. v. Pere Marquette Ry., 248 I.C.C. 215, 226-27 (1941)("[F]acilities provided for the display and sale of perishable produce delivered at the produce terminal are facilities for commercial transactions not part of transportation.").  These cases are distinguishable by the fact the businesses which leased land from the railroads for their distribution centers were not common carriers, nor were they involved in transportation per se.  They were customers of the railroads, i.e. shippers or receivers, who wished to locate their distribution centers as close to the point of delivery as possible. For example, in CNFR Operating Company, the operator of the bulk distribution center contracted with the railroad to deliver pumice and cement to the distribution center.  The operator would then haul the goods from the distribution center to customers who had ordered it from the operator.  CFNR Operating Co., 282 F. Supp. 2d at 1118.  Locating the distribution center on railroad property did not transform the activities taking place into rail-road business

10

or "transportation."  Id. at 1118-19.

The situation in another case relied on by Defendants, Hi Tech Trans, LLC, v. New Jersey, 382 F.3d 295 (3d Cir. 2004), was more subtle.  In that case, Hi Tech, the operator of a transload facility nearly identical to that at issue here, brought an action against New Jersey seeking declaratory relief similar to that requested here.  The Third Circuit ruled that the transload facility, which loaded CDD from trucks onto rail cars for transportation by rail, did not involve "transportation by rail carrier," such that the ICCTA preempted New Jersey's waste disposal regulations.  Id. at 308; 49 U.S.C. § 10501(a).  The Sixth Circuit's conclusion was based on the fact that the railroad had virtually no involvement or control over the operation of the facility:

> . . . Hi Tech operates its facility under a License Agreement with [the railroad]. Pursuant to the terms of that license agreement, Hi Tech is permitted to use a portion of [the rail yard] for transloading. Hi Tech is responsible for constructing and maintaining the facility and [the railroad] disclaims any liability for Hi Tech's operations. Thus, the License Agreement essentially eliminates [the railroad's] involvement in, and responsibility for, the operation of Hi Tech's facility. Hi Tech does not claim that there is any agency or employment relationship between it and [the railroad] or that [the railroad] sets or charges a fee to those who bring C&D debris to Hi Tech's transloading facility.

Id. at 308 (citations omitted).  The Third Circuit assumed, arguendo, that the transload facility met the statutory definition

11

of "transportation" and "railroad," but because Hi Tech was not a rail carrier, the activities occurring at the facility did not amount to "transportation by rail carrier," but rather "transportation 'to rail carrier.'"  Id. at 308-309.

> Accordingly, it is clear that Hi Tech simply uses [the railroad's] property to load C&D debris into/onto CPR's railcars. The mere fact that [the railroad] ultimately uses rail cars to transport the C&D debris Hi Tech loads does not morph Hi Tech's activities into "transportation by rail carrier."

Id. at 309.  Since Hi Tech was not a rail carrier, New Jersey's regulations were not preempted by the ICCTA.  Id. at 310.

Prior to the Third Circuit's decision, Hi Tech had filed a petition for declaratory relief with the STB seeking a determination that the STB had exclusive jurisdiction over Hi Tech's transload facility.  See Hi Tech Trans, STB Finance Docket No. 24192.  The STB declined to issue the requested declaratory order because "it is clear that the Board does not have jurisdiction over truck-to-rail transloading activities that are not performed by a rail carrier or under the auspices of a rail carrier holding itself out as providing those services."  Hi Tech, STB Finance Docket No. 24192, at 5 (Slip Op.) (emphasis added). The STB held that "[t]here is no dispute that Hi Tech's transloading activities are within the broad definition of transportation.  The Board has consistently found such activities

12

to be transportation under 49 U.S.C. 10102(9)." <u>Id.</u> at 5-6.
Nevertheless, the STB found that Hi Tech's activities did not meet
the second half of the statutory equation, that being that the
transportation must be performed by a rail carrier.  The STB came
to this conclusion partly because the license agreement between Hi
Tech and the railroad virtually eliminated any involvement in, or
liability for, the operation of the facility on the part of the
railroad, but also because the transportation agreement between the
two made Hi Tech  nothing more than a shipper.  <u>Id.</u> at 6-7.  The
transportation agreement provided that

> . . . Hi Tech is solely responsible for loading C&D
> debris onto rail cars at its own expense. [The railroad]
> does not hold itself out to provide C&D debris
> transloading service, quote rates for such services, or
> charge customers for it. [The railroad] is responsible
> only for transporting the loaded rail cars.
>
> * * *
>
> The facts of this case establish that Hi Tech's
> relationship with [the railroad] is that of a shipper
> with a carrier.  Hi Tech brings cargo and loads it onto
> rail cars, and [the railroad], under the Transportation
> Agreement, hauls it to a destination designated by Hi
> Tech.  . . .  There is no evidence that [the railroad]
> quotes rates or charges compensation for use of Hi Tech's
> transloading facility.

<u>Id.</u> at 3, 6-7.  Even though Hi Tech's activities were
transportation, Hi Tech's position was that of the operators in
<u>CFNR Oerating Company</u> and <u>Florida East Coast Railway Company</u>: a
customer of the railroad.  It was Hi Tech who was offering the CDD

13

shipping service to the public, not the railroad.  Although Hi Tech contracted with the railroad to carry the CDD, the actual shipping service was **not performed by a rail carrier or under the auspices of a rail carrier holding itself out as providing those services.**"  Hi Tech, STB Finance Docket No. 24192, at 5 (Slip Op.).  Consequently, the STB concluded that it did not have jurisdiction over Hi Tech's activities because those activities were not "an integral part of [the railroad's] provision of transportation by rail carrier."  Id. at 7.

Here, the relationship of IWG to CN is not one of a shipper to a carrier, but one of a contractor working "under the auspices of a rail carrier."  Id. at 5.  IWG is not CN's customer.  Rather, IWG provides transloading services so that CN may complete its obligations under CN's transportation agreements with its shippers.  It is CN, the railroad, who is holding itself out as providing the CDD transloading services.  CN interacts with the shippers, quotes rates, contracts, bills and collects.  Thus, the CDD transloading services occurring at CN's transload facility are "**performed . . . under the auspices of a rail carrier holding itself out as providing those services.**"  Hi Tech, STB Finance Docket No. 24192, at 5 (Slip Op.).  For this reason, the activities occurring at the Rockwood transload facility appear to be "integrally related to the

14

provision of interstate rail service," and are therefore subject to the STB's jurisdiction and federal preemption.  Borough of Riverrdale, Petition for Declaratory Order, STB Finance Docket 33466, 4 S.T.B. 380, 1999 STB LEXIS 531 (Sept. 9, 1999)(Slip Op. at 9).

Defendants also argue that the state and local regulations at issue are not preempted because they are environmental regulations that do not prevent the operation of the transload facility and are a valid exercise of Defendants' police powers to protect the health and safety of the community.  See Boston and Maine Corp. v. Town of Ayer, 330 F.3d 12, 16-17 (1st Cir. 2003)("[T]he STB found state and local regulation to be permissible where it does not interfere with interstate rail operations, and localities retain certain police powers to protect public health and safety." (Quotation omitted)); Flynn v. Burlington Northern Santa Fe Corp., 98 F. Supp. 2d 1186, 1189 (E.D. Wash. 2000).  While the ICCTA does not preempt a local authority's traditional police powers and environmental regulations enacted in accordance with those powers, the ICCTA does preempt such regulations that stand as an obstacle to a carrier's ability to construct facilities or conduct operations.  City of Auburn v. United States, 154 F.3d 1025 (9th Cir. 1998); Green Mt. R.R. Corp., 404 F.3d at 643-44.

It appears to the Court that the regulations imposed by

Defendants are preempted.  See City of Auburn, 154 F.3d 1030-31; Green Mt. R.R. Corp., 404 F.3d at 642; Soo Line R.R. Co. v. City of Minneapolis, 38 F. Supp. 2d 1096, 1101 (D. Minn. 1998).  As for Defendant Wayne County's Soil Erosion and Sedimentation Control Ordinance and Solid Waste Ordinance, it appears to the Court that these environmental regulations are preempted insofar as they would require CN to make substantial capital improvements, thereby necessarily interfering with CN's ability to carry out its operations.  See CSX Transp., Inc. v. City of Plymouth, 92 F. Supp. 2d 643, 659 (E.D. Mich 2000)(Edmunds, J.); Green Mt. R.R. Corp., 404 F.3d at 644.

Finally, Defendants argue that any preemption of Defendants' regulations would be an unconstitutional use of Congress's commerce power.  Defendants' argument is twofold: First, Defendants characterize their regulations not as regulations focused on the transload facility, but as regulations focused on the effect the facility has on the environment.  Using this characterization, Defendants then argue that instead of regulating an instrumentality of interstate commerce, they are regulating an activity that affects interstate commerce, and since the effect is incidental, the Commerce Clause does not permit of preemption.  See United States v. Lopez, 514 U.S. 549 (1995).  Second, Defendants argue that the regulations at issue are not the type that demand a

16

national, uniform rule, and that only diverse rules can meet the local necessities involved. See Cooley v. Bd. of Wardens, 53 U.S. 299 (1851).

Defendants first argument relies on the three permissible categories of Commerce Clause regulation enunciated in United States v. Lopez: 1) "the use of the channels of interstate commerce;" 2) "the instrumentalities of interstate commerce;" and 3) "those activities that substantially affect interstate commerce." Lopez, 514 U.S. at 558-59. If a regulation is of the third type, then the regulated activity must actually have a substantial effect on interstate commerce, not just an incidental one. Id. at 557-59. However, "[w]here a statute regulates the 'instrumentalities of interstate commerce,' the law need not address conduct having a substantial effect on interstate commerce in order to survive a constitutional challenge. Rather, the mere character of the activities covered under the statute make them properly the subject of federal regulation." United States v. Owens, 159 F.3d 221, 226 (6th Cir. 1998).

Defendants contend that their regulations fall into the third category because they regulate environmental impact, not the railroads. They further argue that because the regulated activity's impact on interstate commerce is only incidental, the regulations are beyond the preemptive power of the Commerce Clause.

17

Defendants' characterization, however, is inaccurate. The railroads are one of the archetypical "instrumentalities of interstate commerce," and as such any regulation of them by Congress need not be aimed at "conduct having a substantial effect on interstate commerce in order to survive a constitutional challenge." Id.; see Overstreet v. North Shore Corp., 318 U.S. 125, 130 (1943) (analogizing roads to railroad tracks in order to declare them instrumentalities of interstate commerce).

Defendants' alternative argument relies on Cooley v. Bd of Wardens, which upheld a state law that required ships to employ a local pilot to navigate the Port of Philadelphia, and Ray v. Atlantic Richfield Co., 435 U.S. 151 (1978), which upheld another state law that required certain ships be escorted by tugboats within the Puget Sound. In each case, the Supreme Court upheld the local regulation because the local necessities involved in navigation demanded specialized rules, not one national, uniform rule. Cooley, 53 U.S. at 319; Ray, 435 U.S. at 179-80. Defendants argue that local land use regulations similarly require diverse and specialized rules in order to take into account local necessities.

Yet, one need only to look to the extensive federal land use regulations enacted for the protection of the environment and compiled in Title 40 of the Code of Federal Regulations to know that this is not always the case. Furthermore, the opinions in

18

Cooley and Ray dealt with the limitations on state regulation of interstate commerce imposed by the dormant Commerce Clause, which "has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce" and "limits the power of the States to erect barriers against interstate trade" in areas where Congress has not legislated. Cooley, 53 U.S. at 318-19; Ray, 435 U.S. at 178; South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 87 (1984); Lewis v. Bt Inv. Managers, 447 U.S. 27, 35 (1980). Whereas, the regulations at issue here are not limited through Congress's inaction, but through Congress's express action, i.e., the ICCTA expressly preempts such regulations, and ICCTA is an affirmative exercise of the Commerce Clause. "Because of the plenary nature of the commerce power and because of the primacy accorded federal law by the supremacy clause, the balance of interests between the federal and state governments is an inappropriate consideration in determining whether a federal act is a valid exercise of the commerce power." Texas v. United States, 730 F.2d 339, 351 (5th Cir. 1984)(footnote omitted). Thus, both of Defendants' constitutional arguments are unpersuasive.

CN has shown a strong likelihood of success on the merits of its case. The Defendants' regulations appear to interfere with CN's operations. The state and local regulations at issue appear

to be both within the jurisdiction of the STB and preempted by the ICCTA.

**B.   Whether CN will suffer irreparable injury without the preliminary injunction**.

CN has alleged that if Defendants' regulations are enforced and it is prevented from operating the transload facility, then CN will suffer the loss of its current contract for transportation of CDD, as well as the loss of future contracts and customer goodwill. The Sixth Circuit has noted that "a plaintiff's harm is not irreparable if it is fully compensable by money damages." Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992). If the "**nature** of plaintiff's loss would make damages difficult to calculate," then an injury is not "fully compensable by money damages." Id. (emphasis added).  This does not mean that whenever monetary damages are difficult to calculate that the injury is irreparable.   Rather, the very "nature" of the loss must be inherently difficult to calculate.   The loss of goodwill from existing customers has also been held to be irreparable by the Sixth Circuit, as well as the loss of goodwill from prospective customers.   Id. at 512 ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."); Michigan Bell Tel. Co. v. Engler, 257 F.3d 587, 599 (6th Cir. 2001).

20

With this in mind, the loss of CN's current contract is not irreparable, because it is compensable by easily calculated money damages. However, the loss of goodwill from CN's existing customers is irreparable, as is the loss of goodwill from prospective customers. The loss of future contracts and the loss of the opportunity to enter a market, here the market for transportation of CDD, are inherently speculative, making damages too difficult to calculate. Hence, these loses are also irreparable. Cf. CNFR Operating Co., 282 F. Supp. 2d at 1119. Consequently, based on the loss of goodwill, future contracts and market opportunities, the Court concludes that CN will suffer irreparable injury without the preliminary injunction.

**C.    Whether issuing the preliminary injunction order would not cause substantial harm to others**.

Defendants allege that they will suffer substantial injury if an injunction is issued, because operation of the transload facility will result in environmental pollution. On the contrary, there is nothing in the record to indicate that CN's facility will cause **substantial** harm if allowed to operate as intended. Federal environmental statutes and regulations will still be in force to address continuing environmental concerns. See Grafton & Upton R.R. Co., 337 F. Supp. 2d at 239. Moreover, the services agreement between CN and IWG provides additional protections. Also,

21

according to CN, CDD is both non-hazardous and non-putrescent.  Pl.
Br. at n.1.  Therefore, the issuance of the preliminary injunction
would not cause substantial harm to others.

**D.   Whether the public interest would be served by issuance of the injunction**

While the issuance of the preliminary injunction would serve
the public interest insofar as it would promote industry in the
region, the record does not demonstrate that the shipment of CDD
would be a significant industry.  Though, the benefit of additional
industry, when coupled with the protection offered by federal
environmental regulations, does balance against the potential harm
such an industry might have to the public interest.  As it stands,
this factor militates neither for, not against, the issuance of an
injunction.

**E.   Balancing the four factors for a preliminary injunction**

Three of the four factors, including the most important factor
of a strong likelihood of success, favor the granting of the
preliminary injunction.  The fourth factor neither favors nor
disfavors the it.  The Court will therefore grant the preliminary
injunction.

**F.   Posting of a Bond**

Finally, Rule 65 of the Federal Rules of Civil Procedure also requires that,

> No restraining order or <u>preliminary injunction</u> shall issue <u>except upon the giving of security by the applicant</u>, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c) (emphasis added).  Application of Rule 65(c) has been construed by the Sixth Circuit as being within the sound discretion of the trial judge.  <u>Urbain v. Knapp Brothers Manufacturing Co.</u>, 217 F.2d 810 (6th Cir. 1954).  Failure to consider the question of security has been considered error by the Sixth Circuit.  <u>Beukema's Petroleum Co. v. Admiral Petroleum Co.</u>, 613 F.2d 626, 629 (6th Cir. 1979).

The sum posted on bond should reflect the limit that may be recovered by a wrongfully enjoined party, because a party later found to have been enjoined wrongfully will be limited to that amount.  Since it appears at this time that Defendant might suffer only minimal loss or damage by reason of the issuance of this preliminary injunction, a bond of $10,000 is required of Plaintiff.

**III.   CONCLUSION**

**ACCORDINGLY, IT IS HEREBY ORDERED** that Plaintiffs' motion for a preliminary injunction [docket entry 5, erroneously refiled as

23

docket entry 20] is **GRANTED.**

    **IT IS FURTHER ORDERED** that Plaintiffs' motion for a temporary restraining order [docket entry 5, erroneously refiled as docket entry 20] is **DENIED.**

    **IT IS FURTHER ORDERED** that Defendant City of Rockwood's motion for leave to file a supplemental response [docket entry 21] is **GRANTED.**

    **SO ORDERED.**

Dated: <u>June 1, 2005</u>         <u>s/Paul V. Gadola</u>
                              HONORABLE PAUL V. GADOLA
                              UNITED STATES DISTRICT JUDGE

Certificate of Service

I hereby certify that on <u>June 2, 2005</u> , I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:
  <u>Kerry L. Morgan, Steven Roach , Nelson O. Ropke</u> , and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: <u>    
 Howard E. Gurwin   </u> .

                      <u>s/Julia L. Delling</u>
                      Julia L. Delling, Case Manager
                      (810) 341-7845